Good morning. May it please the court, counsel. My name is Ross Day. I'm the attorney for the appellants in this case. Burt Linda Aylward, Jerry Harshman, George Cameron, Johnny West, and Kay Weick. As an initial matter, counsel for the Forest Service has brought up the question of mootness with regards to Mr. West's claim. And we concede that to the extent that his claim is an issue in this matter, that claim certainly is moot. As to the other appellants, their claims are still alive because they have yet to receive an approval on their plans of operation. Are you saying, then, that when you do receive the approval, the case will be moot? I believe so. I believe it's entirely possible that if, it's not when, it's if we receive the approval, that the case may very well be moot. Have they applied for approval at this point? They have, and they're in the process, they're going through the process, but they haven't received final approval of their plans of operation. When I heard counsel in the prior case describe the policy in their, the policy issues in their case, I thought, boy, I should just tape record that and play it here. Because basically what we're talking about in this case, the central question that the court's being asked to decide is whether or not my clients are entitled to have their day in court. In order to understand exactly what I mean by that, we need to step back and take a look at the facts that we know that are in the record. We know that in a prior case, well, first of all, we know that the minors, I'll refer to them as the minors, received approvals on their plans of operation. In that approval, the Forest Service made a determination that an environmental impact statement wasn't necessary. And then the HCPC filed a lawsuit, Hell's Canyon Preservation Council versus the Forest Service, in which the district court enjoined the minors from taking further action on the minors' plans of approval. However, that was an action that the minors were never joined in. The Forest Service filed a- We could have intervened, right? We could have, but mandatory intervention. First of all, we didn't know about the case until at the earliest, February 21st, 2001, three-and-a-half months before the district court made a final determination and an order in this case. Secondly, mandatory intervention, a mandatory intervention rule is disfavored by the Supreme Court. That's true. And thirdly, if I might, this circuit has recognized that the standards for joinder and intervention are nearly identical. In that first case, the Forest Service filed a motion to dismiss for failure to join necessary parties, and the district court in that case said that the minors were not necessary parties because the action filed by Hell's Canyon by the council did not involve and would not affect the rights of the minors. It only would affect the Forest Service-  I'm sorry? on a permissive intervention basis. I find it hard to believe you wouldn't have been allowed into the case. I'm sorry? I find it hard to believe you would not have been allowed into the case. As I understand it, the HCPC was allowed into this case. That's correct. They intervened, and they were allowed in. But again, mandatory intervention rule is- I mean, you can't force people to be litigants, especially in a case that was all the way- That may be true, but isn't the ultimate question- that's a question of the rules, right? In other words, as construed in Martin v. Wilkes, the federal rules don't require mandatory intervention. They could, but they don't. Right. The question really at this juncture is really a due process question, whether you were precluded from being heard someplace. And you weren't precluded from being heard someplace. You could have gone into that case. Well, I disagree. We have been precluded from being heard. We filed a petition under the APA. We made an appeal of the letters, which revoked our rights under the- But the difference between this case and Martin v. Wilkes is that your problem now is with the federal government, and the federal government has sovereign immunity and can only be sued under narrow circumstances, and this may not be one of them. But all of that's only a constitutional problem. If there was no way you could have been heard, and there is a way you could have been heard, which is going into the other case. Well, again, that would require that this court to adopt a rule that no other circuit and certainly the Supreme Court has disfavored, and that is a mandatory intervention. You're going to penalize my- The judge, first of all, has asked you about permissive intervention. Why couldn't you have gotten permissive intervention in that case? Well, you know what? We may very well have. But then you could have been heard. Well, but we shouldn't be penalized because we chose not to intervene in that matter. Again, to do so- What's your solution? I mean, if in fact the problem right now is that you have a defendant that has sovereign immunity and it can only be sued if certain conditions are met and it appears that they probably weren't, i.e., what's the final agency action that you're suing over? The final agency action is the issuance of the letters of what I call the letters of revocation that were sent to my client saying you have to cease and desist, you can't mine anymore until you file new- Weren't those letters essentially simply informing you of something that had happened in the court? Well, that's the central point of this matter. I mean, we need to understand the 30,000-foot level view of this case. In the first case, the court said, the district court said, look, whatever the result, it's not going to have any bearing on the miners. So practically speaking, if the miners were to come to me prior to that decision being issued in June and said, hey, should we intervene? I'm going to read the court's decision on the motion, on the joiner motion, and I'm going to say, well, no, because the judge here says that this isn't going to affect you. Absolutely. And then once the order came down, you could have gone in at that point and intervened for permission to either file a Rule 6CB motion or appeal. Well, and again, at that point, we had no idea. As we read certain- That's what you did. Well, no, I disagree. At that point, all it said was the actions of the Forest Service are vacated. It was at that point that the Forest Service said, well, that must mean that these guys, the way we are interpreting it, the decision we're making is that that means the miners are no longer entitled to operate. Let's assume that's a final decision, a final agency action, the revocation of the permits. How can it be an arbitrary and capricious agency action if the agency was ordered to do it by a court? Again, Your Honor, the agency wasn't ordered to do – the order did not, from the court, did not say revoke their plans of operations. The relief sought by the plaintiffs- That's exactly what it did. I thought it revoked the plans of operations. You're right. That's accurate. It vacated the plans of operations. What did the agency do other than comply with the court order? The agency sent a letter saying your plans of operations- Have been vacated. No, until you file new plans of operations. What did you expect the agency to do? I mean, the agency couldn't have gone ahead and reissued the letter saying, well, we've got this court order vacating. We're going to go ahead and reissue them anyway. I expected the agency to say when they sent us those letters and we sent our appeal in, I expected the agency to say, okay, we're going to give you your chance to argue whether or not- To argue to whom? Argue to the agency under the APA. But the agency said it was under a court order. I'm sorry? The agency had a court order that it was vacated. You didn't want the agency to say it's not vacated, did you? You know, I think what we're – the difficulty, the rock and the hard place that my clients find themselves in is because the relief that was sought by the plaintiffs in the original case was not as against my clients. It was only against the Forest Service. And it wasn't to vacate the plans of approval. Well, you know, your case isn't an unsympathetic case, but that's not the end of the problem. You get sympathy but not much else. There are things you could have done at that point. Even then, when the court issued that kind of an order, you can intervene and appeal the order. But the question is what could the agency do? You were trying to show that the agency had not only taken a final action, which I'm willing to assume, but that it was an arbitrary and capricious action. And there's nothing in what the agency did that's arbitrary or capricious. All it did was comply – it tried to help you. I mean, it said to the judge, you know, bring them into the case. And the judge said no. And then it gave the agency an order. And the court agency said to you, here's the order. We are required to vacate it. Now, what's arbitrary and capricious about saying to you, we have been directed to vacate it, so it's vacated? The Forest Service has very specific rules that it must follow when it's making a decision to revoke. Those are – But they didn't make the decision. The court made the decision. Well, if the court – but the court had said earlier that our rights would not be affected. Right. So your problem is with the earlier case. And so the real issue is how does Martin v. Wilkes apply in a circumstance like this? That's correct. So your problem is with the earlier case. That's correct. Martin, of course, was also a settlement, not an adjudication. But I think the principle still stands. And, of course, both the Forest Service and the counsel argue that the public rights exception applies here. But there's an – as there always is in the practice of law, there's an exception to the exception articulated in Kettle Range. These – my clients can no longer – can no longer operate under those approved plans of operation. On June 27, 2001, they could dig holes. But your clients were not permanently deprived of any property right, were they? I'm sorry? Your clients were not permanently deprived of any property right, were they? Certainly they were. The – as a result of the court's decision, assuming for the moment that the court had jurisdiction to vacate the earlier approved plans of approval, the result are additional plans of approval now that are moving through the court. Do you have a property right in the – I mean, basically what we have here, as I understand it, is a situation in which you have no right to mine unless you get permission from the agency to mine. And there are a bunch of standards by which the agency is supposed to decide whether or not you have a right to mine. And in this instance, they did it wrong. They didn't – according to the court, they didn't apply the right standards. So you didn't have a right to mine under federal rules – federal law. So how can you have a vested right to mine when the agency – the court has decided that you didn't have a right to mine? If I understand what your question is, did we have a legally – basically a legally protected interest in the plans of operation? I mean, was that something that basically, you know, in my line of work, the vested rights issue? And there's – the Clouser v. EPSI case – or SB, excuse me – case makes it clear that a mining claimant, once they have a successful claim, which my clients certainly do, and they thought they had approved plans of operation, they were told, go out and dig. Go out and start making money. My clients no longer – they lost that right. They lost a right, most certainly a very tangible right, a right that they invested money in, a right that they – Well, they didn't lose it permanently. They lost – it's delayed while the agency goes through some more procedures. And I disagree. They did lose something permanently. As a result of the first case, my clients have been forced to go back under an environmental impact statement analysis that we don't think we're subject to, which is an issue that we've never been able to raise, an environmental impact statement review that has, in effect, come back to really harm us. It has imposed additional regulations, which has caused my clients to not only lose income, but also to lose some of their investment as well. So I think, in other words, the difference between the old plans and the new plans, I think that is exactly what my clients have lost. I mean, that is exactly how they've been harmed. But you have to be relying on the right to operate a plan of operation that was improperly awarded to you. Well, Your Honor, that's – I don't think it was improperly awarded to us. I understand that. But ultimately, if you – the only way you would have something vested is if you would have it, whether it was proper or improper. You would only have it if it was proper. Is that where you're at? No. What I'm saying is what the court was trying to decide in the first case is whether it was proper or improper. It decided it was improper. That was the last judgment. It was improper if you shouldn't have been allowed to mine. So how do you have a legal interest in mining when it's improper for you to mine? Well, first of all, the court adopted the stipulated facts that the parties entered into where the Forest Service said, yeah, we admit we erred. Well, we don't think they did, and we never had our chance to plead our case. Well, they did err because they relied on the categorical exclusion. They had to go back and do it over again. It could be that on another theory – that there was another theory on which they were right, but they weren't right on the theory that they relied on, so as a matter of administrative law, they were wrong. Well, again, they relied on a categorical exclusion, which we believe they had a right to rely on. However, that issue was never litigated in the underlying case because the Forest Service simply conceded that, hey, we screwed up. We don't think they did. We think they got it right the first time. Counsel, have you got a Bivens action here? I don't believe we do because I think the statute's run. But you would have. You might have. We might have, yeah. We may very well. And, you know, I can't foreclose any future actions. But the fact of the matter is that all we want to do, all we'd like to do is argue before somebody who will listen that, hey, look, we were entitled to a categorical exclusion, and here are the 28 reasons why. That's all we want to do. In this instance, unlike in Martin v. Wilkes, your interests were front and center in that earlier case. And what you're arguing for is the right to file your own case after the fact instead of going into the case in which you could have made some difference. But that's just it. Our rights weren't front and center in the first case. The judge, in his opinion on the Joinder motion, said they weren't. They said they're only seeking relief against the Forest Service, not against any other. The only rights, the only way, the only injunction that's going to apply is against the Forest Service. So as a practitioner, I'm sure you all can appreciate this. Your clients come in. They say, should we intervene in this? I'm going to look at that and say, well, no, because your rights aren't at issue in this case. The judge said so. They have a right to rely on what the judge found. That turned out to be a mistake, I guess. You have three minutes left. Do you want to save it? I do, Your Honor. May it please the Court. Michael Gray on behalf of the Forest Service with me at the table is Peter Frost representing the Health Canyon. Could you start by telling us what status? I think you sent us a letter about the other claims. My impression is they're on the verge of being completed. Is that correct? That's my understanding from the responsible Forest Service officials, that there are three outstanding approvals or plans of operations, one of which hasn't been submitted to the Forest Service yet. The speculation is that because it's not yet mining season. Who submits this, the mine owner? The miner would have to submit the plan of operations for approval by the Forest Service. What's happened is the Forest Service has studied this in an EIS and issued a rod that imposed some mitigation measures that weren't in the plans as they were originally submitted. They sent letters to the miners and said, if you resubmit your plans in compliance with the conditions we've imposed in the rod with the correct bond, they'll be approved. That's happened with one of the miners. One has submitted a plan, but the bond was a couple hundred dollars too low, and so they're waiting to get the bond. Have you told the council that all it takes is a couple hundred dollars more on the bond? I did have discussions before I sent the letter in about the status and relayed basically what we said in our letter, which was that the bond was insufficient and once they submit the bond, it will be approved. My understanding from the Forest Service is that for one of the other miners, the bond has been submitted, but the miner lost his copy of the plan of operations, and so we've had to send them a new one for him to resubmit it, and so that will be approved as soon as it comes. We expect that. While you're both here today, maybe when the argument's over, you could go out in the hall and get these things straightened out. This client could get the extra couple hundred dollars. That makes another moot case. The guy who lost his plan, I'm sure his lawyer can get a copy. You can get that one taken care of. What does that leave? There's one other that has not yet been submitted to the Forest Service at all. Our speculation is that it's probably just because it's not yet mining season, and so they haven't gotten around to resubmitting it. As long as these things are submitted in compliance with the conditions that we set out in the rod, they will be approved and the case will be moved. Were these mines operating in the interim as well, under one year? They were. We approved one-year plans that were, I think maybe the conditions for the mining might have been a little less as well. I'm not certain about that. So was there any period of time that they weren't operating? There may have been a period of time between when we sent in the letters at issue in this case and when we approved those one-year plans of operations. I don't know how long that period of time was. The two actions are in the administrative record, and so we can figure it out, but I'm not sure how long that was when they were not mining. Thank you. Before we leave the practical aspects of this case, if you two would at the end of the argument get together and see if you can expedite the solution of this case, and then will you send us a letter in 10 days and let us know whether matters are resolved? It doesn't sound like it should take very much to solve the rest of the problems. We'd be happy to do that as well. Thank you, Ken. Okay. Do you agree that under the regulations, the agency did not have the authority once it made a mistake in approving these plans of operations to revoke them? That's right. The regulations, 228. If that's so, does that give them a property right in the plan of operation? If it's something that they can be given that can't be revoked? The way that these mine claims work is that if the miner has discovered a valuable deposit of a locatable mineral and that's shown, then the miner has a valid claim. And once they have a valid claim, and that turns on whether there's some reasonable expectation of making a profit out of the claim, then they do have an interest in real property that's good against the U.S., but it's subject to those regulations. To a plan of operation. Right, subject to all the regulations. That's a different problem. But then they comply with the regulations, or they purport to, and they submit something and it's approved, let's say, erroneously. Clearly erroneously. You violated every right in the book, but you approved it. That's right. Now, are we being told that the federal government's position is that they can make a terrible mistake in approving something and these people now have a right to go ahead and do it, continue to do it because you can't stop them and say, wait a minute, we made a mistake? I believe that's been our position. The regulation, let's see if I can, the 228.4E gives the Forest Service the authority to modify a plan or to require more NEPA work only when there are unforeseen significant disturbances of surface resources. So the authority under the regs depends on a finding that something more has happened, and that's why in the Hell's Canyon case where it was clear that the one-year categorical exclusion for multi-year plans was an error, that we informed the district court that under our regulations we don't have the authority ourselves to do that because the miners do have these limited property rights if they've shown a valid claim. And that's why the – It's very exceedingly odd to me to think that they have a property right to operate in violation of federal law because you don't have the right to straighten out a mistake you made. I've never seen a scheme set up that way. That seems very odd to me as well. That's my understanding from the Forest Service of how the regulations work. I don't know what else. Could somebody have brought an APA challenge at the time that you issued these permits? Could HCPC have come in and said, wait a minute, you can't do this, I'm going to challenge the grant of the permit under the APA? Yes, and that's what happened in the Hell's Canyon case. They challenged our approval of those plans of operations. We then said that yes, in fact, that approval was wrong because we relied on the one-year categorical exclusion for multi-year plans. You couldn't revoke your decision. That's my understanding. Could you challenge the case or do you have to wait for the court to issue an order? I'm not sure, Your Honor, how that works exactly. Could you have come in and confessed error? Essentially what we did is we confessed error and then the district court vacated our approvals, set them aside under the APA. That was the source of a lot of the procedural confusion here, though, because if you had told the district court to begin with what ultimately happened, which is that, in fact, he was going to have to issue an order revoking or vacating the plans of operation rather than simply determining whether you were right or wrong, then he might have decided otherwise with regards to the Rule 19 issue, right? I don't believe so. If you read his joinder opinion, he does have the language in there about I don't have to enjoin the minors, but he goes on to say in that opinion that what I am going to have to do is vacate the approvals and that may have the effect of — What he's going to have to do is require the agency to vacate the approvals. If he had required the agency to vacate the approvals rather than ordering them vacated himself, then we wouldn't have this final agency action problem, right? Because he would have taken a final agency action, and at least there would have been a second suit that could have been brought. I think under the APA, the remedy would be to set aside the unlawful agency action, and I think that the magistrate judge understood that in his order on joinder, that the relief he would have to give would be to set aside the approvals. That was the agency action, and he explicitly says in there, that may impede the mining these claims while they redo NEPA, but that's not a sufficient interest for joinder purposes. I do think that there is a serious final agency action problem here. If you look, there are only five circumscribed discrete agency actions, a rule, sanction, or relief. I think it's pretty clear this is not one of those three. If that's so, what is your ultimate position about how these individuals should have projected their interest? They should have sought permissive intervention. What do you do with Martin v. Wilkes? Martin v. Wilkes, I don't think applies. I'm not sure that that would affect the permissive intervention. What it says is you have to be joined in under the public rights exceptions. This court's Connor case and the Kootenai tribe case. Connor is very interesting because Connor was decided well before Martin v. Wilkes. That's true. And it has an example in it which seems to be directly counter to Martin v. Wilkes. It's exactly the discrimination issue which was involved in Martin v. Wilkes, and it's prevasting to be that it has to come out the other way. Then it came out in Martin v. Wilkes. So I don't know about Connor. It seems a little shaky to me. Well, Martin v. Wilkes does not overrule the national licorice case, which set up the public rights exceptions. The national licorice case and Connor and Kettle, whatever it is, in all those cases seem to understand that what you can't do is extinguish the right. In other words, national licorice. There has to be some recourse. And what you seem to be saying here, at least with your final actions in the action period, is there was no other recourse. Well, what those cases say is it can't extinguish other rights. So, for instance, they've alleged that they suffered this harm from not being able to mine. They might be able to bring a temporary takings case, and that wouldn't be precluded by the Hell's Canyon case. And we think we'd have a good defense to that temporary takings case in that we were required by court order. But nonetheless, they could still bring that type of a case. What they can't do is seek to re-litigate what happened in the first Hell's Canyon case. If there are no further questions, I think I'm done. Thank you, counsel. May it please the Court, I'm Pete Frost. I represent the Hell's Canyon Preservation Council in this case, and Mr. Gray was going to tell you that I was going to make a brief argument on behalf of the defendants. It's a rare position for me to be in, to be defending the Forest Service in a case, but I'm happy to do it. And I do want to stress four points that I think distinguish our position from the agency's and certainly from the appellant's. At the outset, Judge Berzon, this goes to your question related to the regulations by which the Forest Service may modify or change. They can't modify? They can modify. If the agency itself is taking the initiative to modify and approve plan of operations, they have to follow the regulatory procedures to do so. But I have never heard a federal agency argue that it is barred somehow by its regulations from implementing a court order. And, in fact, I think there would be a statutory or constitutional problem with that. No, they didn't say that. The question was not whether they could implement a court order. The question is if they discover that they have issued a permit illegally, can they do anything about it? They can. Yes, they can. But that's not what happened in this case. What happened in this case is the magistrate judge decreed that they had illegally approved the permit. I know, but you're just asking a question. I didn't ask you what happened in this case. Judge Berzon has asked several times the question of whether this agency is prohibited from withdrawing the permit if it discovers it issued it improperly. And that's all I'm asking you. And are you saying it is not barred from doing that? It is not barred from doing it. It must follow its regulations to withdraw that kind of approval. But they said their regulations don't provide for withdrawing. They provide for modifying them. Because, ultimately, it may have something to do with the strength of the claim by the minors as to whether they have a vested right or don't have a vested right. If the plan of operation could be modified or withdrawn any time it was discovered that there was a legal error made, then their argument is considerably weaker, it seems to me. So I'm trying to understand whether it could be withdrawn. Frankly, Your Honor, I don't have the regulatory language in front of me related to it. I believe the verb is to modify an approved plan of operations. They do have the regulatory authority. If you don't know the answer to the question, you could tell us that, too. That's one of the permissible answers. I don't know. Is that it? Yes, Your Honor. That is it. I anticipated this Court was going to a different place. And that was about it. But I appreciate the distinction. Just move on. If I may, the other point that I would like to make to this Court is, relates to the interrelationship between joinder and intervention. In the cases in which we bring against Federal agency frequently, entities will seek to intervene as of right or permissibly in those cases. And what generally happens under the case law in the Ninth Circuit is entities such as these minors are denied the ability to participate in the merits phase of a lawsuit but are allowed to participate in the remedy phase of a lawsuit as of right. And the case that stands for that proposition is Forest Conservation Council of the U.S. Forest Service. And there's a more recent case, the Kootenai Indian Tribe case that also talks about this kind of bifurcation. There's no dispute. Why weren't there Rule 19 defendants for purposes of remedy? Why were they not? They lack the significant protectable interest for the purposes of joinder. But there are other criteria for intervention, including adequacy of existing representation. Rule 19 defendants often are joined only for purposes of remedy. That's correct, Your Honor. They would have to come to the Court and demonstrate their entitlement to intervene on that basis or to be joined on that basis. And they didn't do that. I mean, it's very clear in this case, based on the record before you, that this agency bent over backwards to inform the minors of what was going on in the merits phase of the first case. Let's suppose that the district judge was an error in this Rule 19, even either in general or at least for purposes of relief, especially as things turned out with regard to what relief was necessary. And also because it turned out that the agency confessed error anyway. What recourse would they have at that point? Any recourse? They could have sought to intervene after the district court had entered its judgment before the time for appeal had run, which is what the minor lessee is to do. You deal with Martin v. Wilkes at that point. Well, I mean, that's what happened in Connor v. Burford. And, Your Honor, you have noted that it was decided a year beforehand. But I agree with the Forest Service that the public's interest exception survives Martin v. Wilkes. And there have been other cases decided by this Court related to the relief in which they could have moved at that time. And I think they could have. They could have done that. So for them to come here today and make essentially an equitable argument of unfairness about what has occurred to them, I think, is unfound. The third point I want to make that I think is important relates to the possibility of mootness in this case. I don't know what kind of negotiations may go on between the Forest Service and the minors as to any reclamation bonds. Counsel for the Forest Service did mention that one of the minors has not yet even submitted a plan of operations to mine again this summer. I think this is a case that is capable of repetition, yet evading review, because this was essentially a procedural case against the agency. It's a terribly sui generis case in terms of what happened here. I'm sorry? Isn't it quite sui generis? What's capable of repetition? What's capable of repetition here is the legal issue arising again that if a plaintiff comes back into Federal court and proves that the agency has violated a procedural requirement and the district court is in the position of having to decide what to do about it, if that judge were to once again set aside the agency decision, the agency goes back and fixes it. And so we're back in the same cycle again, and that is whether or not the district court has the authority to do what it does. Well, there's an opportunity to litigate that the next time it comes up. It's not going to escape review. I don't understand why. Yes, it's a problem that can occur again. Because if the basis of the jurisdictional claim brought is the procedural infirmity that is fixed, then we're back again and again with the same kind of case as this one. But it also seems to turn on a quirk in the regulations that the Forest Service thinks that they can't go back and correct it voluntarily, and you've told us that you don't have a position on that. It would require us to decide something that you haven't taken a position on, and the Forest Service at least has told us that they can't correct. I have to confess, I don't fully understand this line of questioning, Your Honor. I had thought the question related to whether or not the ---- Well, if you've only got a minute left, don't waste too much time telling us what you don't understand. Okay. Well, let me tell you. I think the Forest Service does have the authority under its regulations to withdraw an illegal plan of operations and fix it. And I think there are temporal and other kind of regulatory parameters for its decision to do so. But its regulations do anticipate that happening, and I think it does have the authority to fix it. Thank you, Your Honor. Thank you very much. Thank you all. The case just argued will be ---- Oh, did you? Let's go see. I had a couple of questions. All right. Yes. Again, Ross Day for the appellant. It seems to me that we're going down a road that I don't think we necessarily want to take this circuit down. Compulsory intervention. Mandatory intervention. Penalizing people for not intervening in a case that they could have intervened in. That is a theory. So what is your solution? This is the problem. Well, I don't think it's a very strong argument, because either this is ---- in order to have this suit go forward, you either have to demonstrate that there is a final ---- you have to demonstrate both that there's a final agency action and an arbitrary and capricious agency action. And those are often looked at abstractly and not against some sense that you should be able to be heard someplace. It's not a very strong argument. In other words, you're asking us to kind of bend the rules about what's a final agency action and what's an arbitrary and capricious action in order to get you heard someplace when there was a place you could get heard, which was back in the original case. Well, see, I disagree that this is a ---- that this is really bending any of the rules. The fact of the matter is that the district court in the first case was very clear. The district court said that the plaintiffs have alleged no misconduct on the part of the claimants, but instead challenged only the Forest Service conduct in approving the plans. Plaintiffs, the counsel, are not seeking a court injunction directing the claimants to stop their mining operations. That's what the court found in the first case. Okay? There is no reason for us, up until June 21st, when the order was officially entered, 2001, there was no reason for my clients to have any idea that what ---- and, in fact, they didn't pray for that. Let's suppose that's all true, and let's suppose also that there was some reason why you couldn't, shouldn't or didn't intervene at that point. How do you get or what do you do next? What happens next? Okay. What happens next? The court vacates the plans of approval, the plans of approval, a remedy that was not prayed for in the original action. And so the court vacates those, sends the order to the Forest Service. Now the Forest Service has to make a decision that is, okay, what do we do? Well, but ---- I.e., do we comply with the court order or not? No. How do we do this? Do we revoke the plans of operation, which is what they ultimately did? They were ordered to revoke the plans of operation. Well, and again ---- I'm sorry. They weren't ordered to revoke. They were revoked. They were revoked by the ---- I'm telling you that they were revoked. And see, that's where the court's decision, they didn't ---- the court did not have jurisdiction in the Hell's Canyon case. That may be, but we're past the ---- your premises were past the Hell's Canyon case, and you had no responsibility to go into that case. What happens next? They issue their letters of revocation. At that point, we are entitled to an appeal. There is nothing in their regulations that says that they're entitled to revoke. They're entitled to modify, but there's nothing in their regulations that says they're entitled to revoke plans, approved plans of operation. But it was already revoked. So we file an appeal, and we say that's what we wanted to do. But it was at that point, which is the basis of this suit, we were denied our right to appeal. And that's what we're looking for. Thank you. Thank you, counsel. The case is adjourned. It will be submitted. The court will stand in recess for the day. All rise. The score for this session stands adjourned. Thank you.
judges: Reinhardt, Berzon, Bybee